IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHWEWSTERN DIVISION

KIMBERLY JO POWERS, )
)
        Plaintiff, )
)
vs. ) Case No. 10-5018-CV-J-ODS
)
MICHAEL J. ASTRUE, )
Commissioner of Social Security, )
)
        Defendant. )

## ORDER AND OPINION AFFIRMING COMMISSIONER'S FINAL DECISION

Pending is Plaintiff's request for review of the final decision of the Commissioner of Social Security denying her disability application. The Commissioner's decision is affirmed.

## I. BACKGROUND

Plaintiff is a 37-year-old female with a work history as an administrative assistant, merchandise clerk, office manager, and receptionist. She suffers from obesity, degenerative disc disease of the cervical spine, fibromyalgia, and carpal tunnel syndrome.

Plaintiff was seen by Joseph L. Mayus, M.D., a rheumatologist, on November 1, 2006. Plaintiff reported she had carpal tunnel release surgery in the past. Plaintiff also reported pain affecting multiple sites in her body. A radiology report revealed degenerative changes involving cervical (neck) vertebrae C4 through C6. Dr. Mayus' impression was that Plaintiff was suffering from cervical spondylosis,[1] fibromyalgia, and

---

[1] "Cervical spondylosis is a disorder in which there is abnormal wear on the cartilage and bones of the neck (cervical vertebrae)." See http://www.nlm.nih.gov/medlineplus/ency/article/000436.htm (last visited on December 15, 2010).

localized left shoulder pain, with possible impingement syndrome. Dr. Mayus increased Plaintiff's prescription for gabapentin (an anti-seizure and pain medication) and "encouraged [Plaintiff] to stay as active as possible."

Plaintiff returned to Dr. Mayus for a follow up of her fibromyalgia on December 13, 2006. Plaintiff reported "chronic, unremitting pain." Plaintiff's pain areas were her left shoulder, feet, lumbosacral area, and neck. Plaintiff described a "feverish" sensation throughout her back with "considerable tenderness." Dr. Mayus substituted her gabapentin with cyclobenzaprine (a muscle relaxant used to treat pain) and Arthrotec (used to treat osteoarthritis and rheumatoid arthritis).

As part of her disability application, Plaintiff completed a function report dated January 20, 2007. Plaintiff wrote that she cleans house and goes shopping on days when her pain is minimal, but stays in bed or on the couch on "bad" days. She is able to shower, dress herself, feed herself, use the toilet, go grocery shopping, and take her own medications (which cause drowsiness). She claimed she took care of her husband (doing laundry and making meals), stepson (getting him up for school, doing laundry, and making meals), and a cat, although her husband and stepson cleaned the cat's litter box. She indicated some of her activities, such as shaving her legs, cleaning the house, and cooking, are limited by the pain in her shoulders, back, legs, and feet, although she also stated her pain was "bearable" most of the time. She did not do yard work, indicating that straining herself during the day would lead to sleepless nights. She also indicated she would limit her medications before she drove. Even with the activities she could do, her pain symptoms reportedly caused her to take longer to do them. She claimed to have difficulty concentrating, but she could pay attention for "a long time" if she was "interested and not distracted."

After his two examinations in late 2006, Dr. Mayus completed a residual functional capacity questionnaire on May 1, 2007. Dr. Mayus identified symptoms of pain in several areas in Plaintiff's body, describing the pain as chronic, deep, aching, constant, and aggravated by motion. Dr. Mayus also identified several functional limitations and concluded Plaintiff would miss 4 days of work per month as a result of her impairments. Two vocational experts later testified a hypothetical worker with all the

limitations found by Dr. Mayus would not be able to work.

Plaintiff did not seek treatment for her pain again until March 4, 2008, when she visited an emergency room complaining of back pain that started 2 days previously. She rated her pain as a 9 on a scale of 1-10. She was noted to have fibromyalgia and was dismissed with a diagnosis of back pain.

After Plaintiff lost her insurance coverage, she started seeing Christopher W. Billings. D.O., as her primary care physician. Dr. Billings did not note any complaints of pain when Plaintiff visited him on April 9, 2008, although he did note her fibromyalgia diagnosis and wrote her a prescription for Flexeril (a brand name for cyclobenzaprine) and Cymbalta (used to treat depression and fibromyalgia pain).

Plaintiff's follow-up appointment was 2 weeks later. Dr. Billings noted Plaintiff was continuing to take Avinza (a brand name for morphine), which helped her pain. Dr. Billings continued this prescription and Plaintiff's prescription for Cymbalta. At her next appointment, Dr. Billings noted "overall pain control has been good," although he also noted Plaintiff was taking Extra Strength Tylenol as needed for "breakthrough pain."[2] Dr. Billings noted Plaintiff was "going well with overall pain" at her appointment on June 18, 2008.

Dr. Billings indicated Plaintiff was having less success with Avinza in July 2008, noting Plaintiff's pain control was only "moderate" and that she still had "episodes of pain." In September 2008, Dr. Billings discontinued Avinza and started Plaintiff on Duragesic (a skin patch containing the narcotic fentanyl, used to treat moderate to severe pain). Plaintiff continued to take Cymbalta.

On November 5, 2008, Plaintiff reported to her new doctor, Russell Bond, D.O., that she was unable to tolerate Duragesic. Plaintiff complained of neck pain (7 on scale of 1-10) and back pain (8 on scale of 1-10). Dr. Bond prescribed Plaintiff Cymbalta, Flexeril, and Amrix (cyclobenzaprine). Despite the pain she reported to Dr. Bond,

---

[2] "Intense increases in pain that occur with rapid onset even when pain-control medication is being used. Breakthrough pain can occur spontaneously or in relation to a specific activity." *See* http://www.cancer.gov/dictionary/?CdrID=45612 (last visited on December 16, 2010).

3

Plaintiff reported to another provider that she was able to walk 2 miles 3-4 times per week.

Dr. Bond ordered an MRI of Plaintiff's neck be completed and referred her to Edwin Cunningham III, M.D.  Dr. Cunningham reviewed the MRI and examined Plaintiff on December 28, 2008.  Plaintiff's chief complaints were neck pain, left arm weakness and numbness, decreased range of motion in her cervical spine, and gait difficulty.  Plaintiff also reported for the first time that she had been experiencing a room-spinning sensation and had been falling down.  Dr. Cunningham recommended Plaintiff undergo neck surgery.

On January 6, 2009, Plaintiff underwent a "C5-6, C6-7 infereior cervical discectomy with fusion."  Plaintiff was discharged the next day.  Plaintiff followed up with Dr. Cunningham on February 4, 2009, complaining of continued neck pain, "dysesthetic"[3] pain in her left hand and arm, and "whole right hemibody numbness."  Plaintiff also reported continued falls.  During a visit with her general practitioner on February 16, 2009, Plaintiff reported her "sensitivity" in her left arm had improved, but her doctor noted she could not feel anything on her right side except pressure and, for her right leg, itching.  She reported no falls during this visit.

The ALJ conducted a hearing on March 31, 2009.  Plaintiff told the ALJ her condition had not improved since surgery.  Plaintiff stated she had neuropathy in her right thigh and "lost use" of her left arm, later adding she dropped things with her left hand "all the time" and experienced "pretty much the same thing" with her right hand.  With respect to her current medications, Plaintiff complained of tiredness caused by Flexeril, hydrocodone (which also made her unable to drive), and Neurontin.  Plaintiff also testified she took her Xanax prescription just once per day due to side effects.

When asked at the hearing whether she could perform one of her prior jobs, Plaintiff notably did not testify she was unable to work because of pain.  Rather, she

---

[3] Dysesthesia is "**2.**  A condition in which a disagreeable sensation is produced by ordinary stimuli; caused by lesions of the sensory pathways, peripheral or central.  **3.** Abnormal sensations experienced in the absence of stimulation."  *Stedman's Medical Dictionary*, p. 531 (26th ed. 1995).

indicated it was her concentration that prevented her from working, stating, "[H]alf the time I can't even think of the words I'm trying to say." Plaintiff also stated she would lose track of a 30-minute television show and could not make a grocery list, but admitted she could drive from her home to doctor visits (a 35-minute trip) once per month "without any trouble."

Although she did not testify she was unable to work because of pain, she did testify her pain made her unable to vacuum and unable to walk for more than 5 minutes without resting. Plaintiff also stated her husband does most of the cooking because her coordination was not good, and she stated she would sometimes fall when she was walking through the house, adding that she had fallen about three or four times in the last 2 months and that she would faint about once or twice per month. Plaintiff also stated she had to sit leaning to one side or the other, which was "not comfortable at all ever."

At the conclusion of the hearing, the ALJ referenced Dr. Mayus' opinion from May 2007. The ALJ noted "a lot has happened since then" and decided testimony from a medical expert at a supplemental hearing was required.

Before the date of the supplemental hearing, Plaintiff returned to Dr. Cunningham on April 20, 2009, reporting no falls but continuing to complain of left arm dysesthetic pain and numbness/weakness. Although Plaintiff complained that her left arm had worsened since her last visit, Dr. Cunningham noted her left arm strength had improved, later stating this problem had "completely resolved." Dr. Cunningham also found her dysesthetic pain and right hemibody numbness were "stable" and recommended no intervention. But the next day, Dr. Cunningham authored an unaddressed letter courtesy copied to Plaintiff's counsel, which read in part:

> [Plaintiff] has continued to note dysesthetic left arm pain that is disabling to her, especially with persistent or increasing activity. This has been present for 5 months and at this time, it is my opinion that her pain syndrome will be chronic and will likely impair her functional status. Excessive work loads exacerbate her left arm pain.

The ALJ held the supplemental hearing on July 28, 2009. Based on her review

5

of the medical records, the medical expert testified Plaintiff could lift or carry 20 pounds occasionally and 10 pounds frequently, although Plaintiff would need to use both arms if repeated lifting was necessary due to her left arm. Plaintiff's left arm also limited her to only occasionally pushing/pulling with that arm, but her other extremities were unaffected. The medical expert testified Plaintiff could reach overhead only with her right arm on an occasional basis, but otherwise Plaintiff could reach normally with her right arm and occasionally with her left. The medical expert also stated Plaintiff could stand or walk 6 hours in an 8-hour workday and could sit without limitation.

In denying Plaintiff benefits, the ALJ credited the medical expert's testimony and discredited both Dr. Mayus' opinion and Plaintiff's testimony regarding the severity of her condition. Regarding Dr. Mayus' opinion, the ALJ found it was "clearly inconsistent" with the medical expert's testimony, Dr. Cunningham's opinion, and Plaintiff's statements regarding her daily activities. Regarding Plaintiff's subjective complaints, the ALJ found these were inconsistent with her daily activities and unsupported by the medical evidence. The ALJ's assessment of Plaintiff's residual functional capacity primarily reflected the abilities and limitations described by the medical expert, and based on hearing testimony from a vocational expert, the ALJ concluded there was a significant number of jobs in the national economy Plaintiff could perform, precluding a finding of disability.

## II. DISCUSSION

"[R]eview of [the Commissioner's] decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole. Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion. [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision. *Forsythe v. Sullivan*, 926 F.2d 774, 775 (8th Cir. 1991). Substantial evidence

means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Smith v. Schweiker*, 728 F.2d 1158, 1161-62 (8th Cir. 1984).

Plaintiff makes two arguments for reversal. First, she argues the ALJ should have given controlling weight to Dr. Mayus' opinion regarding the nature and severity of her impairments. Second, she argues the ALJ neglected to analyze her evidence of pain. In determining whether Plaintiff's arguments have merit, the Court will limit its review to the grounds supplied by the ALJ in his decision.[4] *See Burlington Truck Lines v. United States*, 371 U.S. 156, 168-69 (1962) ("[C]ourts may not accept appellate counsel's post hoc rationalizations for agency action.")

*(1) The ALJ Was Not Required to Give Dr. Mayus' Opinion Controlling Weight*

"A treating physician's opinion is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record." *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010) (citations and internal quotations omitted); *see* 20 C.F.R. § 404.1527(d)(2). When a medical opinion is not given controlling weight, the ALJ must consider all the following factors in deciding what weight the opinion should receive: (1) examining relationship; (2) treatment relationship (length, frequency, nature, and extent of relationship); (3) supportability; (4) consistency; (5) specialization; and (6) any other factors tending to support or contradict the opinion. 20 C.F.R. § 404.1527(d).

An ALJ need not explicitly discuss each of the factors in 20 C.F.R. § 404.1527(d) in deciding what weight to give a medical opinion. *See Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *cf. Wildman v. Astrue*, 596 F.3d 959, 968 (8th Cir. 2010) (noting ALJ need not explicitly discuss *Polaski* factors). Rather, an ALJ need only

---

[4] The Commissioner's brief partly relies on grounds not cited by the ALJ, such as the fact that Plaintiff was not always compliant with treatment. The Court will not consider these post hoc rationalizations.

7

articulate "good reasons" for the weight given a treating source's opinion. 20 C.F.R. § 404.1527(d)(2).

The ALJ explained he gave no weight to Dr. Mayus' opinion because it was inconsistent with the medical expert's opinion, Dr. Cunningham's opinion, and Plaintiff's report of her daily activities. Plaintiff maintains Dr. Mayus' opinion was uncontroverted and cites several cases for the proposition that an uncontroverted medical opinion should control.

To support her argument, Plaintiff challenges the medical expert's testimony, noting first the medical expert did not examine Plaintiff. "[T]he opinions of nonexamining sources are generally, *but not always*, given less weight than those of examining sources." *Willcockson v. Astrue*, 540 F.3d 878, 880 (8th Cir. 2008) (emphasis added) (citing 20 C.F.R. § 404.1527(d)(1)). Like opinions from other nontreating sources, ALJ's must consider the six factors in 20 C.F.R. § 404.1527(d) in weighing nonexamining sources' opinions. *See* 20 C.F.R. § 404.1527(f).

One of these six factors is the specialty of the medical source. *See* 20 C.F.R. § 404.1527(d)(5). The ALJ gave controlling weight to the medical expert's opinion in part because she is a specialist in rheumatology. Plaintiff contends this was "the wrong specialty for someone with a fusion," but rheumatology was also the specialty of *Dr. Mayus*, whose opinion Plaintiff maintains should have controlled. And fibromyalgia, which is considered to be a rheumatic condition, was frequently referenced in Plaintiff's medical records. The ALJ could give greater weight to the medical expert's opinion because of her specialty.

The other reason the ALJ gave controlling weight to the medical expert's opinion was because her conclusions were based on a thorough review of Plaintiff's medical history. Nonexamining sources in particular are to be evaluated according to the "the degree to which these opinions consider all of the pertinent evidence in your claim." 20 C.F.R. § 404.1527(d)(3). Plaintiff complains the medical expert was never asked about or discussed Plaintiff's allegations of pain. While true, the medical expert's opinion was based on the medical records, which documented Plaintiff's complaints of pain to her doctors. Plaintiff, of course, had the opportunity at the hearing to question the expert

8

about Plaintiff's complaints of pain.  Plaintiff has not shown the medical expert failed to consider all the pertinent evidence in her claim.

Plaintiff also challenges the ALJ's conclusion that Dr. Mayus' and Dr. Cunningham's opinions were inconsistent.  Plaintiff implies that if the ALJ found Dr. Cunningham credible, the ALJ likewise should have found Dr. Mayus credible.  Plaintiff relies on Dr. Cunningham's statement that "her pain syndrome will be chronic and will likely impair her functional status."  Plaintiff asserts it is "absurd" to deem this statement inconsistent with other evidence of disability.

The error in Plaintiff's reasoning is that Dr. Cunningham's statement refers to the pain syndrome *only* in Plaintiff's left arm.  Dr. Cunningham stated his surgery "significantly helped her right arm pain," and he identified *no* other conditions besides Plaintiff's left arm pain.  In contrast, Dr. Mayus' opinion was that Plaintiff experienced chronic, deep, aching, and constant pain on many parts of her body, including her right forearm, and that Plaintiff would experience her symptoms "possibly indefinite[ly]."  The ALJ credited Dr. Cunningham's opinion while still concluding Plaintiff was capable of working; the ALJ could not have done this with Dr. Mayus' opinion.  In this manner, Dr. Cunningham's opinion was consistent with the medical expert's and inconsistent with Dr. Mayus'.

*(2) Plaintiff's Subjective Complaints Were Evaluated Properly*

Symptoms, such as pain, are subjective.  *See* 20 C.F.R. § 404.1529(c)(3).  When a claimant complains of symptoms, an ALJ must consider the following so-called *Polaski* factors in determining whether the claimant's complaints are credible: "(1) the claimant's daily activities; (2) the duration, frequency, and intensity of the condition; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions."  *Wildman*, 596 F.3d at 968 (internal quotations and citation omitted).  Additional factors include work history and the absence of objective medical evidence to support the complaints.  *Id.* (internal quotations and citation omitted).

9

The primary reason the ALJ gave for discounting Plaintiff's statements regarding her symptoms was her daily activities, which included some cooking, cleaning, shopping with her husband, driving, and talking to her mother on the phone. The fact Plaintiff engages in these activities "does not in and of itself constitute substantial evidence that a claimant possesses the residual functional capacity to engage in substantial gainful activity." *Harris v. Secretary of Dept. of Health and Human Services*, 959 F.2d 723, 726 (8th Cir. 1992) (citation omitted). But these activities *are* "inconsistent with subjective complaints of disabling pain." *Medhaug v. Astrue*, 578 F.3d 805, 817 (8th Cir. 2009) (citations omitted). In addition, the ALJ noted that in November 2008 Plaintiff reported she was walking 3-4 times per week, 2 miles each time. Walking for exercise also is inconsistent with complaints of disabling pain. *See Forte v. Barnhart*, 377 F.3d 892, 896 (8th Cir. 2004).[5]

The ALJ additionally noted Plaintiff was taking Neurontin, Xanax, hydrocodone, and Flexeril, and that the medications made her feel "tired," but he did not discuss this evidence further. Plaintiff argues the ALJ failed to consider the dosage, effectiveness, and side effects of her medications. But Plaintiff never mentioned to her physicians she was experiencing side effects from her current medications. *Cf. Barrett v. Shalala*, 38 F.3d 1019, 1024 (8th Cir. 1994) (holding ALJ considered credibility factors where ALJ noted claimant never discussed side effects of medication with doctor or asked for modification of medication); *Hajek v. Shalala*, 30 F.3d 89, 92 (8th Cir. 1994) (noting in response to claimant's assertion he quit taking medication due to side effects that there was no evidence claimant mentioned side effects to physicians). And even if the ALJ neglected to consider the dosages and effectiveness of Plaintiff's medications, it did not prejudice her. On April 20, 2009, just a few weeks after the initial hearing, Dr. Cunningham noted Plaintiff was experiencing "[n]o neck pain or no right arm symptoms"

---

[5] Plaintiff acknowledges the ALJ considered her daily activities to evaluate her credibility, but argues the ALJ failed to also consider how her pain "may or may not impact her daily activities." But Plaintiff does not argue she is unable to perform any of the daily activities the ALJ identified, and these activities speak for themselves–they are inconsistent with her complaints of pain.

and that "[t]he neurontin has helped the pain but off of it secondary to the pregnancy." Plaintiff does not argue her medications were ineffective.

Plaintiff also contends the ALJ failed to consider her symptom's precipitating and aggravating factors, but this is incorrect; the ALJ noted Dr. Cunningham's statement that Plaintiff's dysesthetic left arm pain was "disabling to her, especially with persistent or increasing activity." The ALJ also noted Dr. Cunningham's statement that "[e]xcessive work loads exacerbate her left arm pain." The ALJ's residual functional capacity reflects these factors by containing limits on Plaintiff's ability to use her left arm. Plaintiff points to no other precipitating or aggravating factors the ALJ should have considered.

Plaintiff further argues the ALJ failed to consider her functional restrictions, but this too is incorrect. After determining what weight to be afforded the different medical opinions, the ALJ used the functional restrictions noted by the medical expert, as well as Dr. Cunningham's opinion of Plaintiff's left arm pain, to determine Plaintiff's residual functional capacity. The functional restrictions reflected in the medical expert's and Dr. Cunningham's opinions were considered by the ALJ.[6]

The ALJ determined that, based on the vocational expert's testimony, Plaintiff was unable to perform her past work partly because of her functional limitations. Plaintiff acknowledges the ALJ considered her prior work in this context, but contends the ALJ should have considered how her pain *impacted* her prior work. But such analysis presumably would show that Plaintiff was unable to perform her prior work, a conclusion the ALJ reached without this analysis. Plaintiff has not explained how the ALJ's decision would have changed if the ALJ specifically considered the impact of pain on her prior work.

Lastly, Plaintiff argues the ALJ failed to discuss the duration, frequency, and

---

[6] The functional restrictions Plaintiff references–such as her purported need for unexcused breaks and absences–are based on Dr. Mayus' opinion and Dr. Cunningham's statement her pain syndrome would be "'impair her functional status.'" The Court has already concluded (1) the ALJ properly discredited Dr. Mayus' opinion, and (2) Dr. Cunningham's statement concerned Plaintiff's left arm, not her entire body.

11

intensity of her pain. An ALJ is not required to include a discussion of how every *Polaski* factor relates to a claimant's credibility. *See Wildman*, 596 F.3d at 968. It is enough if an ALJ acknowledges and considers these factors. *See id.* The ALJ stated he considered all symptoms in accordance with 20 C.F.R. § 404.1529, "which largely mirror[s] the *Polaski* factors." *Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007). And in addition to the factors discussed above, the ALJ also considered the lack of objective medical evidence supporting Plaintiff's complaints that she lost use of her left arm, had no feeling on the right side of her body, and experienced dizziness, fainting, and frequent falls.

The ALJ explicitly discredited Plaintiff's testimony and gave reasons for doing so. The Court will defer to the ALJ's credibility determination. *See Jones v. Astrue*, 619 F.3d 963, 975 (8th Cir. 2010) ("If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, we will normally defer to the ALJ's credibility determination" (internal quotations and citation omitted)).

## III. CONCLUSION

The Commissioner's decision is affirmed.

IT IS SO ORDERED.

/s/ Ortrie D. Smith
ORTRIE D. SMITH, JUDGE
DATE: January 3, 2011   UNITED STATES DISTRICT COURT